# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**MARIA ALICEA GONZALEZ**,
Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
Defendant.

Civil No. 18-1222 (BJM)

## OPINION AND ORDER

Maria Alicea Gonzalez ("Alicea") moves to reverse the Acting Commissioner of the Social Security Administration's ("the SSA" or "the Commissioner") decision to redetermine and terminate her Social Security Disability Insurance benefits following a referral from the Office of the Inspector General ("OIG"). Dkt. 14. The government defended its decision, Dkt. 17, and Alicea replied. Dkt. 18. The case is before me on consent of the parties. Dkts. 11, 13.

For the following reasons, the Commissioner's decision is **REMANDED** for proceedings consistent with this ruling.

## STANDARD OF REVIEW

The court's review of Social Security disability cases is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's]

resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987). After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g).

A claimant is disabled under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity

("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

Rather than requesting review of an initial determination, though, the petitioner here appeals a redetermination. "The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." 42 U.S.C. § 405(u)(1)(A). The SSA may have reason to believe fraud or similar fault occurred through its own investigations or through referral of an investigation by the OIG. *See, e.g.*, 42 U.S.C. § 1320a-8(*l*). "Similar fault" occurs when either "an incorrect or incomplete statement that is material to the determination is knowingly made" or "information that is material to the determination is knowingly concealed." *Id.* at § 405(u)(2). "When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to

believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. at §
405(u)(1)(B).

The Appeals Council, which issues the final administrative determination on social security
cases, defines its procedures and guiding principles in the Hearings, Appeals and Litigation Law
manual ("HALLEX"). [1] HALLEX does not provide substantive rules nor does it interpret statutes
as Social Security Rulings do, so it is not entitled to deference. It does, however, illustrate the
recommended approach ALJs and the Appeals Council take in redetermination cases. *See Moore
v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (declining to apply *Chevron* deference to HALLEX);
*but see Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 807 n.9 (6th Cir. 2018) (presuming HALLEX
guidelines were "interpretive rules" after the Social Security Administration so alleged)); *see also
Taylor v. Berryhill*, Civ. No. 16-044, 2018 WL 1003755, at *16–17 (W.D. Va. Feb. 21, 2018)
(deferring to Social Security Rulings and noting HALLEX constitutes "distinct guidelines" for
redetermination procedures).

HALLEX explains that a redetermination "based on fraud or similar fault is a re-
adjudication of the individual's application for benefits." HALLEX I-1-3-25 (updated Feb. 25,
2016). The ALJ charged with redetermining a claim may consider evidence initially submitted as
well as new, material evidence that does not involve fraud or similar fault and is related to the
period at issue. HALLEX I-1-3-25(A). An ALJ generally decides "whether to disregard evidence
based on whether there is reason to believe similar fault was involved," but an ALJ assigned to
redetermine a claim may also be instructed to disregard certain evidence. HALLEX I-2-10-10(A),
Note 1 (updated June 25, 2014). Evidence to be considered can be divided between initial evidence,
submitted for the original claim, and new evidence that a beneficiary may submit for the
redetermination. Pursuant to § 405(u)(2), the adjudicator *must* disregard any information from the
OIG referral which resulted in a finding of fraud or similar fault. *See* HALLEX I-1-3-25(C)(4)(a).
"[A]djudicators do not have discretion to reconsider the issue of whether the identified evidence

---

[1] HALLEX, the Hearings, Appeals and Litigation Law manual, can be located online at
https://www.ssa.gov/OP_Home/hallex/hallex.html.

should be disregarded when based on an OIG referral of information." *Id.*; *see also* SSR 16-1p, 2016 WL 931538 (March 14, 2016). Redeterminations based on SSA findings of fraud or similar fault, however, are treated differently and adjudicators retain discretion to consider the beneficiary's objection to disregarding certain evidence. *Id.*[2] A beneficiary may submit additional evidence if it is "new, material, and related to the time period at issue." *Id.* at I-1-3-25(C)(4)(c). The time period at issue, which Alicea refers to as the "closed period," runs from the disability onset date through the date of the final benefits determination. *Id.* at I-1-3-25(C)(3). The onset date is the date determined by the SSA, rather than the date declared by the beneficiary on his initial application for benefits. "Evidence that post-dates the original determination or decision can relate to the period at issue if it is reasonably related to the time period originally adjudicated." *Id.* at I-1-3-25(C)(3)(c). The adjudicator then determines, based on the eligible evidence, whether the beneficiary was or was not entitled to benefits at the time of the original determination.

Should the Commissioner determine "that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments." 42 U.S.C. § 405(u)(3). The Commissioner may "require such overpaid person or his estate to refund the amount in excess of the correct amount." 42 U.S.C. § 404(a)(1)(A). Beneficiaries may seek a disability insurance waiver to avoid repayment of benefits later deemed to be overpayments. 42 U.S.C. § 404(b)(1) ("there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery . . . would be against equity and good conscience.").

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, self-reported symptoms and limitations as contained in the Social Security transcript, and the case history.

---

[2] The Sixth Circuit held in *Hicks* that this distinct treatment of evidence based solely on the source of referral for redetermination violates the Due Process Clause of the Fifth Amendment. *Hicks*, 909 F.3d at 801–04.

Alicea applied for disability on December 11, 2009. She claimed June 12, 2009 as the disability onset date, and she was insured through December 31, 2013. Ex. 1A. Alicea, a packing operator for Johnson & Johnson with twenty-five years of experience on the job, had stopped working six months prior with claims of bilateral carpal tunnel syndrome, cervicolumbar radiculopathy, insomnia, and emotional problems. Ex. 4E at 3; Ex. 2E at 2. She was 52. Ex. 1A. On her disability report, Alicea listed neurologist Dr. Jose Hernandez-Gonzalez ("Dr. Hernandez-Gonzalez") and psychiatrist Dr. Karen Soto-Medina ("Dr. Soto") as her treating physicians. Ex. 2E at 5. On February 26, 2014, the SSA sent Alicea a letter informing her that Dr. Hernandez-Gonzalez had plead guilty to making false statements or representations in medical reports. Tr. 49.

The letter had its origins in an investigation into social security claims in Puerto Rico that began around the same time Alicea first submitted her disability insurance benefits claim. Dkt. 17-1 ¶ 2 ("Bowles Decl."). In 2009, employees of the Puerto Rico Disability Determination Service warned the SSA that some doctors in Puerto Rico were submitting fraudulent medical evidence to the SSA in disability insurance benefit claims. *Id.* The SSA then referred the information to its OIG, which conducted the investigation with the assistance of the Department of Justice and the Federal Bureau of Investigation. *Id.*; Dkt. 17 at 4. On August 21, 2013, three doctors, a non-attorney representative, and seventy-one disability insurance applicants were indicted for fraud in connection with the OIG investigation. Bowles Decl. at ¶ 3. Dr. Hernandez-Gonzalez was one of those doctors, and he subsequently plead guilty to a conspiracy to make false statements to the SSA. *Id.* at ¶ 4. "Dr. Hernandez admitted that he would exaggerate medical complaints and symptoms in order to maximize the probability that his patients would be approved for Social Security disability insurance benefits." *Id.*; Tr. 52–59 (Dr. Hernandez-Gonzalez plea agreement). Alicea, who saw Dr. Hernandez-Gonzalez in 2008 and 2009, was not one of the applicants indicted.

The SSA began to review the nearly 7,000 cases containing evidence from Dr. Hernandez-Gonzalez and the other indicted doctors. Bowles Decl. ¶ 5. A special team, the New York Fraud Prevention Unit ("FPU"), conducted the first round of redeterminations. *Id.* To redetermine a claim for disability insurance benefits, the FPU excluded evidence from those who had been criminally

charged, including Dr. Hernandez-Gonzalez. Then, the FPU determined whether sufficient evidence remained to support each beneficiary's benefits. The SSA preliminarily determined that about 2,000 beneficiaries could no longer support their benefit allowance without the disregarded evidence. *Id.* The SSA suspended these individuals' benefits, notified them of the redetermination process, and gave them ten days to submit additional evidence before continuing with its redetermination process. *Id.*

The SSA suspended Alicea's benefits and redetermined that she had insufficient support to prove a disability between the disability onset date June 12, 2009 and the date the SSA awarded her disability benefits, January 28, 2010. Exs. 3A, 4A. Alicea does not appear to have submitted additional evidence to the court during the ten-day window. Dr. Arvind Chopra, a state medical consultant, and John Keller, a disability adjudicator, determined that Alicea's condition was "not severe enough to be considered disabling." Ex. 4A at 8. The SSA terminated Alicea's benefits on March 30, 2014 and stated that she was not entitled to benefits on February 8, 2010, when it granted her initial claim. Ex. 8B at 1. Alicea disputed the redetermination and requested reconsideration. Ex. 9B. She was denied. Ex. 6A, Ex. 12B at 1–2. In the denial letter, the SSA affirmed that she had been overpaid $60,841 in benefits. Ex. 12B at 168. Alicea sought a hearing before an ALJ, which took place on June 22, 2017. Tr. 31-48. Alicea and Vocational Expert ("VE") Sarah Gibson testified. Tr. 33.

Alicea supported her initial disability claim with medical reports from Dr. Hernandez-Gonzalez and Dr. Soto. On redetermination, the ALJ disregarded evidence from Dr. Hernandez-Gonzalez in accordance with 42 U.S.C. at § 405(u)(1)(B). Tr. 19, 22 (disregarding Ex. 1F, Ex. 4F). Dr. Hernandez-Gonzalez diagnosed Alicea with carpal tunnel syndrome, cervical radiculopathy, and lumbar radiculopathy in June 2008. Ex. 1F at 2. According to his report, he reached those findings based on an EMG and on nerve conduction studies. *Id.* Dr. Hernandez-Gonzalez referred Alicea for a follow-up cervical spine MRI conducted in June 2009, where the radiologist found degenerative disc disease with moderate central spinal stenosis and moderate degeneratively acquired central spinal canal stenosis with left neural foramina narrowing at the C4-5 vertebra level and neural foramina narrowing at the C5-6 level. Ex. 1F at 6. The radiologist also conducted

an MRI of Alicea's hands, finding moderate osteoarthritis. *Id.* at 7.  In response to SSA inquiries, Dr. Hernandez-Gonzalez submitted a medical report for Alicea on January 7, 2010. Ex. 4F. The ALJ also disregarded this exhibit on redetermination. Tr. 22.

Exhibit 1F, which was entirely disregarded, also includes an imaging report from November 8, 2007 based on a referral from Dr. Edgar Ramos-Mendez ("Dr. Ramos"). Tr. 22; *see* Ex. 1F at 8–10. Dr. Ramos was Alicea's primary care physician. *See* Tr. 42–43. The report found Alicea had diffuse inflammatory joint disease with an active inflammatory component in her wrists and interphalangeal joints. Ex. 1F at 8. Exhibit 4F, also disregarded, contains the same report. Ex. 4F at 12; Tr. 22. The ALJ mistakenly noted that Alicea did not provide medical evidence from Dr. Ramos, but he correctly stated that she failed to identify Dr. Ramos in her initial application for disability benefits and failed to submit additional medical evidence from Dr. Ramos to support her claim. Tr. 24.

Alicea mentioned a second examining physician, Dr. Hernandez-Viera, but there is no medical evidence in the record from that doctor. Tr. 24, 40. She stated that Dr. Hernandez-Gonzalez told her that he would no longer see new patients after he had been seeing Alicea for about a year. He then referred her to Dr. Hernandez-Viera to get her prescriptions. Tr. 40. Alicea stated that she saw Dr. Hernandez-Viera until February 2014. She also mentioned seeing a rheumatologist in 2008, but she did not continue to see him because Dr. Ramos was able to prescribe her the medicine that the rheumatologist recommended. Tr. 37–38. Alicea did not submit any records from the rheumatologist.

The ALJ found "there is simply not enough objective medical evidence to establish any severe impairments, after disregarding the tainted evidence from Dr. Hernandez-Gonzalez." Tr. 24. The MRI imaging scans from June 2009 showed physical impairments, and the ALJ observed that "no other medical evidence submitted . . . showed any functional limitations from these degenerative conditions, or any evidence showing any other physical limitations from other impairments." Tr. 24. Nor did any evidence connect those impairments, which the ALJ judged to be non-severe, to Alicea's decision to stop working. *Id.* The ALJ placed great weight on the SSA medical consultants who found the medical evidence available for consideration during the

redetermination process "insufficient to establish severe impairments. Tr. 24 (citing Exs. 4A, 5A, 7F).

Alicea also claimed emotional problems in her initial application for disability, though she was awarded disability insurance benefits for "disorders of the back," specifically for meeting criteria in Listing 1.04A. Ex. 1A at 1; Ex. 3A at 2. Alicea first saw Dr. Soto on November 13, 2008. Ex. 3F at 1. According to a psychiatric medical report, Alicea came to Dr. Soto seeking treatment for anxiety, restlessness, and a history of depression among other things. *Id.* She reported two to three anxiety attacks per day, each lasting fifteen to twenty minutes. *Id.*

Alicea first visited psychiatrist Dr. Soto in 2008, and she continued to see her every two or three months through mid-2017, when Dr. Soto moved offices and Alicea could no longer visit her easily. Ex. 3F at 1; Tr. 42. Dr. Soto diagnosed Alicea with major depressive disorder on her first visit, November 13, 2008. Ex. 2F at 8–9. During their subsequent five appointments in 2009, Dr. Soto recorded Alicea as appearing anxious and detached, but lacking flights of ideas, cooperating, being oriented as to place, time, and person, having conserved short term memory, average intellect, and neither homicidal nor suicidal ideas. Ex. 2F at 3–7. There are not records from visits to Dr. Soto after November 10, 2009, but Alicea continued to fill prescriptions from Dr. Soto through 2017. *See* Ex. 9F (medical expense reports). The ALJ found insufficient evidence to establish the severity of Alicea's mental impairment. He noted that only three of the visits with De Soto occurred after the disability onset date, and an SSA medical survey found "no limitations from the beneficiary." Tr. 24 (citing Ex. 1E at 2).

Physical and emotional impairments feature in the January 2010 function report Alicea submitted to the SSA as part of her initial application. Ex. 3E. Alicea felt anxious, depressed, and forgetful, and she felt "a strong pain in [her] body that activates with movements" when she woke up to. Ex. 3E at 10. Alicea was responsible for taking care of a pet, but otherwise did not participate in other household chores or care-taking responsibilities. *Id.* at 11. She attributes her inaction to her conditions, which made dressing, bathing, doing her hair, and shaving possible only "with difficulty," limitations, and "a lot of work." *Id.* at 11–12. She stopped managing money and engaging in pastimes since becoming impaired. *Id.* at 14. Alicea stated that others did everything around the house, and she

left home only for medical appointments. *Id.* at 13. Alicea needed reminders to attend her medical appointments and required someone to go with her; according to the function report, her medical appointments were her only regular "social activity." *Id.* at 14.

Alicea checked boxes to indicate that her impairments affected her ability to: get up, squat, bend over, stand up, reach, walk, sit down, kneel, climb stairs, remember, finish tasks, concentrate, understand, follow instructions, use her hands, and get along with others. Ex. 3E at 15. She could only walk a "little time" before needing to stop and rest for a "long time." *Id.* She states that she could not follow written or oral instructions or finish what she started. *Id.* Alicea noticed that she became afraid of "being alone." *Id.* at 16.

The ALJ, reviewing Alicea's responses during the redetermination proceedings, found that she had only mild restrictions in her daily living, mainly consisting of the need for reminders for grooming and medication. Tr. 25. He also identified her social functioning as mildly restricted because she needed accompaniment outside but still used public transportation. *Id.* (citing Ex. 1E). The ALJ also noted the ease with which she communicated with an SSA employee during the claims process in coming to this judgment. *Id.* In the third category, focused on the ability to sustain attention and concentration on a task, the ALJ found mild difficulties only. He weighed Alicea's professed forgetfulness regarding money management against Dr. Soto's treatment notes, which reported full orientation, conserved memory, decreased task persistence, and impaired tolerance to stress. *Id.* The ALJ explained that his finding was affected by the relative dearth of information showing additional or more specific limitations. *Id.*

At the hearing before the ALJ, the VE classified Alicea's job as "unskilled, medium, and physical demand per DOT as well as perform[ed] by claimant."[3] Tr. 44. As a packing operator, Alicea had to sit or stand, package items into boxes, and then place the twenty-five-pound boxes on a conveyor and pallet. Tr. 35–36. She also had to move materials and wash heavy components. Tr. 36. She testified that the work required her to keep her head down, which bothered her neck; to grab boxes, which hurt her back; and to wash pieces by hand, which aggravated her hands to the point that she "almost couldn't

---

[3] SSA Disability Determination Explanations dated March 30, 2014 and May 16, 2014 referred to her job as "skilled medium work." Ex. 4A at 4; Ex. 5A at 5.

grab the pieces." Tr. 36. Alicea also stated that the threat of mistake and reprimand made her nervous, and the increased anxiety made her forget her coworkers' names at times. *Id.*

A hypothetical individual with claimant's age, vocational background, and education who is limited to simple work could work as a packing operator, according to the VE. *Id.* When Alicea's attorney representative sought to ask the VE about a hypothetical individual with the physical limitations Alicea claims, the ALJ made him reframe the question multiple times. *Id.* at 44–45. The VE eventually answered that a person who could lift and carry 10-15 pounds, who could stand for about an hour and sit for two hours, to walk for 15-20 minutes before needing a rest, who could climb, kneel, stoop, crouch occasionally, and who is limited to occasional handling or grasping could not perform Alicea's job or any other work. *Id*. at 47.

The ALJ concluded that there was "no evidence to suggest that her impairments caused her to stop working." Tr. 24. Rather, he stated that Alicea ceased working when her factory closed. Tr. 24 (citing Ex. 2E at 8). In Exhibit 2E, Alicea states twice that she stopped working because of her condition. Ex. 2E at 2, 8. She notes that she began receiving liquidation payments for her years of service in June 2009. *Id.* at 8.

The ALJ ultimately denied Alicea's claim because she lacked a severe impairment or combination of impairments. He held that she was not under a disability as defined in the SSA "at any time from June 12, 2009, the alleged onset date, through January 28, 2010, the date of the prior favorable disability determination (20 CFR 404.1520(c))." Tr. 26.

Alicea appealed the ALJ's decision to the Appeals Council, which also denied her claim. Tr. 1. She then filed the instant complaint, asking the federal district court to review the ALJ's disability determination and challenging the legal procedure applied in her redetermination case. Dkt. 1.

## DISCUSSION

Alicea challenges the redetermination process on Fifth Amendment grounds. Alicea objects to the ALJ's findings, contests the application of "fraud or similar fault" to her case, contends that the evidentiary restrictions violated her right to due process, and objects to the assertion that the SSA overpaid her. The Commissioner disagrees with Alicea on every ground except for the limited timeframe for which evidence was considered, which he did not address.

Typically, district courts review ALJ determinations to ensure there is substantial evidence supporting the ALJ's decision. 42 U.S.C. § 405(g). Here, Alicea raises additional, constitutional questions. The court will begin with alleged errors in the redetermination process in keeping with the constitutional avoidance doctrine. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Should the Commissioner and the ALJ lack substantial evidence supporting their decisions to deny Alicea's claim, then the court need not reach the constitutional question. If, however, there was substantial evidence supporting the elimination of Alicea's benefits, then the court must address the procedure by which that evidence was submitted and considered.

### Sufficiency of the Evidence

On redetermination, the ALJ must disregard the evidence from Dr. Hernandez-Gonzalez pursuant to the Social Security Act. *See* 42 U.S.C. at § 405(u)(1)(B). The ALJ did so, disregarding Exhibits 1F and 4F, though not entirely. Tr. 24. Exhibit 1 included two MRI imaging scans taken in 2009 on Dr. Hernandez-Gonzalez's referral, which the ALJ analyzed for medical evidence of limitations. *Id.* The decision to do so represents both an understanding of what type of evidence Dr. Hernandez-Gonzalez could have exaggerated as well as a break with the strict redetermination rules precluding ALJ's from exercising this discretion. *See id.*; *see also* Tr. 52–59; Bowles Decl. ¶ 4. This exercise of common sense demonstrates the valuable role discretion may play in a redetermination case. The cervical spine scan showed "degenerative disc disease with moderal central canal stenosis and left neural foramina narrowing at C4-5 and neural foramina narrowing at C5-6." Tr. 24 (citing Ex. 1F at 6). A scan of Alicea's hands "showed moderate osteoarthritis and periarticular osteopenia." *Id.* (citing Ex. 1F at 7). Exhibit 1F also included a 2007 imaging report from a referral by Alicea's primary care physician Dr. Ramos. Ex. 1F at 8; Ex. 4F at 12. The scan showed diffuse inflammatory joint disease with an active inflammatory component in her wrists and interphalangeal joints. *Id.* The ALJ overlooked the report, but it might have been excluded in any case because it predated the period for which the SSA would accept evidence, or the "closed period." Tr. 22.

After excluding certain evidence and applying the closed period to the remainder, there was no other medical evidence on the record which demonstrated physical impairment. Alicea referred to a rheumatologist, whom she saw briefly, but did not submit any medical records from him. Tr. 37–38. This dearth of information supported the ALJ's conclusion that Alicea was not disabled. Alicea's function report likewise contained scant information connecting her physical impairments to concrete effects in her work. *See generally* Ex. 3E. Alicea suffers from nonsevere back impairments, but she does not meet Listing 1.04A for a disorder of the back. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.

The ALJ also considered evidence supporting Alicea's mental impairment. Dr. Soto diagnosed Alicea with major depressive disorder on November 13, 2008. Ex. 2F at 8–9. Alicea stated that she saw Dr. Soto on a regular basis through mid-2017. Tr. 42. The closed period includes only three visits with Dr. Soto, and the ALJ reviewed records from each. Tr. 24. Dr. Soto's notes, as the ALJ observed, record a patient with "somewhat decreased memory, adequate judgment, and superficial insight . . . but conserved memory and attention, and fully oriented." Tr. 24 (citing Exs. 2F, 3F). The ALJ took Alicea's "sad moods" into account, but the weight of the SSA employee's interview, which found no limitations, offsets that finding. Tr. 24 (citing Ex. 1E). The ALJ also gave weight to the SSA psychological consultants who, on redetermination, found only nonsevere mental impairments Tr. 24 (citing Exs. 7F, 4A, 5A). The decision that Alicea does not have a severe mental impairment such that she is disabled is supported by substantial evidence, including the fact that her initial disability award was solely for a physical impairment, and the mild limitations her depression caused. *See* Ex. 1A at 1; Tr. 25 (citing function report at Ex. 3E).

In the absence of evidence from Dr. Hernandez-Gonzalez, the only physician from whom Alicea has medical reports concerning her back impairment during the closed period, substantial evidence supports the ALJ's conclusion that Alicea was not disabled within the meaning of the Social Security Act. Because the ALJ found her to be not disabled based on the redetermination procedures laid out in the Social Security Act, the court must address Alicea's procedural due process arguments.

### Due Process

Alicea raises five issues with the procedural due process afforded her in the redetermination process: application of fraud to her case despite no specific finding against her; an unfair process for disregarding evidence; the restricted time period; the limitation to the closed period for establishing a disability and submitting evidence; and overpayment. Dkt. 14 at 2. The government, for its part, supports the ALJ's finding and contends sufficient process is afforded to claimants in redetermination proceedings. Dkt. 17 at 9, 10–16. Alicea's procedural due process arguments may be addressed in three general categories: the application of similar fault or fraud, the closed period restrictions on evidence and proof, and overpayment.

If there is reason to believe fraud or similar fault was involved in a beneficiary's claim for disability insurance, the Commissioner must redetermine benefits and, in that redetermination process, disregard any evidence for which there is reason to believe fraud or similar fault was involved in its provision. 42 U.S.C. §§ 405(u)(1)(A)–(B). Alicea raises an objection to both the application of fraud to her claim without a specific, individualized finding and to the mandated disregard of evidence in cases referred by the OIG. Dkt. 14 at 11–14. The government responds that there is no finding of fraud, so there cannot be a due process violation. Dkt. 17 at 8–9. The government cites as support a policy interpretation ruling. SSR 16-1p, 2016 WL 931538 (March 14, 2016). The semantic argument distinguishes "reason to believe" fraud may have been involved from a determination that fraud was indeed involved. Dkt. 17 at 9, 12. From the government's perspective, this makes all the difference. Alicea contends that the SSA treated her as guilty of participating in fraud when it assigned her claim to the OIG and her hearing to the FPU. Dkt. 14 at 12. She emphasizes that she was neither involved in the conspiracy linking Dr. Hernandez-Gonzalez with other individuals, and she was never shown evidence that supports a reason to believe that she was involved in the fraud that occurred. *Id.* at 9–10. The record before this court includes Dr. Hernandez-Gonzalez's plea agreements and materials relating to his fellow indicted conspirators under the entry "jurisdictional document," but none of it mentions Alicea. *See* Tr. 49–99. Jurisdiction could be made clear in either a short statement about Dr. Hernandez-Gonzalez or

a more complete document demonstrating why the SSA referred Alicea's case specifically for redetermination.

Alicea could not challenge the determination that fraud or similar fault was involved in her application for benefits. *See* 42 U.S.C. § 405(u)(2); SSR 16-1p; HALLEX I-1-3-25(C)(4)(a) ("adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information."). This limitation caused more than just a procedural impact on her claim. The inclusion of the jurisdictional document in her transcript lends an incriminating gloss to the documents that a neutral, factual statement of redetermination would not. It associates her with Dr. Hernandez-Gonzalez's crime in such a way that she cannot extricate herself.

The Supreme Court observed that evaluating fault "usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale." *Califano v. Yamasaki*, 442 U.S. 682, 697 (1979). The *Califano* court, ruling on termination of welfare benefits, did not see how the pertinent circumstances on which finding fault relies, including a beneficiary's physical condition, mental condition, and good faith, "can be evaluated absent personal contact between the recipient and the person who decides his case." *Id.* A one-sided credibility determination judges and, in some cases, punishes a person on papers over which he or she lacked control rather than by their acts or intent, which are more traditional metrics in our legal system. Adherence to procedure in this case leads to the same consequence: the SSA attributes beneficiaries unknowing or innocent of fraudulent, third-party conduct with that criminal act without an opportunity to challenge that determination. *Hicks*, 909 F.3d at 803.

Even if Alicea could have challenged the determination, she argues that limits on the time period at issue and admissible evidence would have hobbled any challenge. Dkt. 14 at 12–24. Had the SSA conducted the investigation into Dr. Hernandez-Gonzalez and the others, then the adjudicator would have retained discretion to consider or disregard the allegedly fraudulent evidence. HALLEX I-1-3-25(C)(4)(a). Here, the SSA initially received tips about suspicious

activity in Puerto Rico disability insurance claims and referred the information to the OIG for investigation, thus guaranteeing any redeterminations would be subject to the stricter evidentiary standards and precluding ALJ's discretion. *See* Bowles Decl. ¶ 2. This case demonstrates the danger of such a black and white rule—the SSA's table of contents instructed that Exhibits 1F and 4F, i.e. Dr. Hernandez-Gonzalez's medical reports, should be disregarded, but each included a medical record from Dr. Ramos. *See* Tr. 167. The ALJ, had he blindly accepted the SSA's designations, might also have overlooked the objective MRI reports created within the closed period. *See* Tr. 24. That careful reading of the record hints at the dangers in treating ALJs like mere paper-pushers; ALJs adjudicate, and they are well-placed to weigh evidence and catch errors inevitable in a process which swept up more than 7,000 cases in Puerto Rico alone. When an ALJ is denied discretion and primed with a largely irrelevant criminal history, it is unsurprising that he might conclude that a beneficiary was being "inconsistent" and failing to provide medical evidence. Tr. 24. Such negative assumptions color the rest of a beneficiary's application and testimony with potentially grave repercussions. The government notes the ALJ's conclusion that the MRI reports alone cannot sustain a finding of disability but does not comment on their status as excluded. Dkt. 17 at 19.

Alicea raises other concerns on the application of the time period in this case: June 12, 2009 through January 28, 2010.[4] She contends that the closed period mathematically prevents her from qualifying as disabled because it extended from June 2009 to January 2010, but disability must be present for twelve consecutive months for the claimant to qualify for insurance. Dkt. 14 at 22. The law, however, enables a claimant to establish a qualifying disability within a period of less than a year if it "*can be expected* to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added). More compelling is her argument about the legality of applying a closed period.

---

[4] In one letter, the SSA stated that the time period would be June 12, 2009 through February 8, 2010. *See* Exs. 10B, 11B. The government does not address the variation in dates.

In the vast majority of social security cases, the only legally relevant period is the date through which the claimant was last insured for disability benefits ("Date Last Insured" or "DLI"). "To establish a period of disability, you must have disability insured status in the quarter in which you become disabled or in a later quarter in which you are disabled." 20 CFR § 404.131; *see also* 42 U.S.C. §§ 423(a), (c)(1). A qualifying DLI, therefore, is necessary for a person to be entitled to disability insurance benefits from the SSA. Alicea's DLI is December 31, 2013. Tr. 22. Alicea argues that law allows her to establish a period of disability at any time during that period, and the use of the closed period is at odds with the policy underlying the DLI. Dkt. 14 at 17, 19. The government contends that Alicea could have filed a new application for disability insurance benefits at any time, so the closed period did not truly preclude her from receiving benefits. Dkt. 17 at 13–14. Because this is a redetermination case, DLI plays a different role. *Id.*

When a claimant files for disability, the onset date he or she chooses is subject to change. An arbiter might conclude that disability began on a later date, so using that onset date as a cut-off may prevent the claimant from later filing evidence created prior to the onset date as support in redetermination proceedings. *Id.* at 19. Normally, this would not have a great impact. In a redetermination case, however, it could lead to the exclusion of evidence supporting a disability at the onset date by, for example, demonstrating a steady deterioration in physical or mental health which might impact the ultimate severity of an impairment. Alicea's medical records demonstrate this precise problem: three of the six appointment notes from Dr. Soto precede the closed period as do records from Dr. Ramos. *See* Tr. 24 (citing Ex. 2F); Ex. 1F at 8–10.

Alicea also argues that she must be given a chance to appeal the SSA's determination that it overpaid her by $60,841.00. Tr. 27; Ex. 12B at 2. The government responds that Alicea may obtain a waiver of the overpayment. Dkt. 17 at 14 (quoting 42 U.S.C. § 404(b)). Beneficiaries may seek a disability insurance waiver to avoid repayment of benefits later deemed to be overpayments. 42 U.S.C. § 404(b)(1) ("there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery . . . would be against equity and good conscience."). Waiver, however, is not guaranteed. In the cases consolidated in

*Hicks*, the SSA declined to offer blanket amnesty to plaintiffs. *Hicks*, 909 F.3d at 802. The statute requires only that so-called overpayments be waived for "any person who is without fault." 42 U.S.C. § 404(b)(1).

The questions Alicea raises are not unique to this district. The Sixth Circuit recently found procedural due process violations in eleven consolidated redetermination cases. *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786 (6th Cir. 2018). A vigorous dissent, however, reflects both the SSA's position, *see* Dkt. 22, and the position of some district courts in the Fourth and Eleventh Circuits. *See, e.g., Robertson v. Berryhill*, Civil No. 16-3846, 2017 WL 1170873 (W.D. Va. March 28, 2017); *Roberts v. Commissioner*, Civil No. 17-565, 2017 WL 5712895 (M.D. Fla. Oct. 27, 2017). Judges decided those cases prior to *Hicks*, many favorably citing cases which *Hicks* overturns. Other district courts in the Fourth and Seventh Circuits, writing after *Hicks*, found the Sixth Circuit opinion persuasive and reached the same conclusion. *Tyler J. v. Saul*, Civil No. 17-50090, 2019 WL 3716817, at *4–8 (N.D. Ill. Aug. 7, 2019); *Kirk v. Berryhill*, Civil No. 17-2189, 2019 WL 2950022, at *7–8 (D.S.C. July 9, 2019). The First Circuit faced a question similar to Alicea's but resolved the matter on threshold procedural grounds before it could reach the due process issue. *Justiniano v. SSA*, 876 F.3d 14, 27–28 (1st Cir. 2017). The First Circuit favorably cited a lower court case affirmed in *Hicks* when it observed that the plaintiffs in *Justiniano* showed "at least a colorable claim of ultimate success on the merits." *Id.* at 28 (citing *Hicks v. Colvin*, 214 F. Supp. 3d 627, 633–46 (E.D. Ky. 2016) *aff'd sub nom Hicks v. Commissioner*, 909 F.3d 786).

Procedural due process varies according to the context, and the Supreme Court established a balancing test to measure the required level of due process in *Mathews v. Eldridge*, 424 U.S. 319 (1976). To evaluate the procedural safeguards the Constitution requires in a given scenario, a court must weigh three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. The courts in *Hicks*, *Kirk*, *Roberts*, and *Robertson* each applied the *Mathews* balancing test to review Social Security disability insurance redeterminations challenged by the plaintiff.[5] Notably, each of those redeterminations involved attorney Eric Conn and ALJ David B. Daugherty, both of whom pleaded guilty to a scheme to defraud the SSA through falsified medical documents in disability insurance claims. *Hicks*, 909 F.3d at 791–92, 797–805 (finding due process violations); *Kirk*, 2019 WL 2950022, at *2 (finding due process violations); *Robertson*, 2017 WL 1170873, at *1, *6–14 (finding no due process violations); *Roberts*, 2017 WL 5712895, at *1 (finding no due process violations). *Hicks* found due process violations in the restrictions placed on ALJ discretion, which varied solely based on which office referred the cases for redetermination. *Hicks*, 909 F.3d at 801–04.

Turning to the *Mathews* factors, Alicea's private interests at stake are clear in her contentions above. The Sixth Circuit in *Hicks* remarked on the unchallengeable association between an innocent beneficiary and a criminal act. *Hicks*, 909 F.3d at 803. Such an association threatens a beneficiary's dignity, and the inability to challenge the government's declaration that there is "reason to believe" the beneficiary was involved in fraud can damage a person's sense of self-worth and reputation in the community. More immediately, the SSA deprived Alicea of the disability insurance benefits on which she relied and requested repayment of the benefits she received. It is commonly acknowledged that a Social Security disability insurance beneficiary has a substantial interest in receiving those benefits, and erroneous termination can cause significant hardship. *See, e.g.*, *Mathews*, 424 U.S. at 342; *Robertson*, 2017 WL 1170873, at *6. Here, the hardship is twofold: termination of payment and a sudden debt of more than $60,000.

---

[5] While these cases each applied *Mathews*, it bears noting that the Sixth Circuit in *Hicks* also applied a minimum due process analysis. *Hicks*, 909 F.3d at 797. The court explained its decision as reflecting that procedural due process in the redetermination context required, "at a minimum, 'a fair opportunity to rebut the Government's factual assertions'" whereas *Mathews* better applies to cases determining whether additional process is due. *Id.* *Hicks* ultimately found that petitioners prevailed under the minimum due process test as well as under *Mathews*. *Id.* I apply *Mathews* as the stricter of the two tests and because both parties considered it the appropriate method.

As to the second *Mathews* factor, the SSA contends that safeguards already in place temper the risk of erroneous deprivation. Dkt. 17. at 14–18. As a preliminary matter, the SSA points out that a new application for disability insurance benefits may be submitted at any time, even during the redetermination process. *Id.* at 14; *see also* HALLEX I-1-3-25(C)(4)(c). Three other extant safeguards the SSA points to are: beneficiaries can submit additional evidence during the ten-day period and prior to a hearing before an ALJ; the ALJ is impartial; and a hearing on the evidence occurs. Dkt. 17 at 15–17.

The SSA notified Alicea that her case would be redetermined in May 2014, and the closed period restricted admissible evidence to medical records from more than five years prior. The ability to submit additional evidence is a strong safeguard, though it is not a panacea for disregarded evidence or the association with fraud. As the courts in *Kirk* and *Robertson* observe, asking plaintiffs to gather medical records from years or decades prior is burdensome. *Kirk*, 2019 WL 2950022, at *9; *Robertson*, 2017 WL 1170873, at *7. Many beneficiaries provide the only copies of their medical records to representatives during the initial claim, others may have lost their records, physicians may have destroyed old reports, and some plaintiffs may have foregone second opinions due to trust in their primary physician. *Kirk*, 2019 WL 2950022, at *9; *Robertson*, 2017 WL 1170873, at *7. The SSA contends that it may help obtain new evidence, but this is limited in several ways. Dkt. 17 at 15. First, such help is only granted when "requested and appropriate." *Id.* The SSA provides aid when "[m]edical or vocational expert advice is needed," but the guidelines imply that having medical evidence completely disregarded does not equate to a need for additional expert advice. *See* HALLEX I-1-3-25(C)(4)(b). Indeed, the SSA circumscribes when it is willing to develop evidence in redeterminations based on fraud or similar fault to "[e]vidence that is new, material, and related to the period at issue" and either incomplete or where "the record does not show that SSA previously made every reasonable effort to develop the same evidence." *Id.* An adjudicator may also request development of new sources of information. This may reduce the risk of erroneous deprivation, but its discretionary nature diminishes its potential impact.

The additional safeguards put forth by the SSA cannot mitigate the greatest risk in redetermination: exclusion of suspect medical evidence. *See Hicks*, 909 F.3d at 801; *Robertson*, 2017 WL 1170873, at *7. Supreme Court precedent indicates that the risk of erroneous deprivation is "unacceptably high" when the plaintiff is denied notice of the SSA's factual assertions and "a fair opportunity to rebut those assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004). Here, the SSA denied Alicea access to its investigative report, which made it impossible for her to challenge those assertions before the ALJ. The fraud or similar fault finding was not even on the table—only the non-excluded medical evidence could be considered. Exclusion presents a multifaceted due process problem. Plaintiffs do not receive notice of the factual determinations detailing the reason to believe fraud or similar fault was involved in their application, large amounts of evidence may be excluded when only small portions likely qualify for exclusion, and OIG and SSA investigation findings are treated differently.

The government also suggests the loss of benefits may be a less significant hardship than it appears because terminated beneficiaries may obtain waivers of overpayment. Dkt. 17 at 14. Because overpayments may be waived for "any person who is without fault," 42 U.S.C. § 404(b)(1), additional evidentiary hearings would have to be held for waiver to qualify as an adequate safeguard. As it stands, the application for waiver includes the same evidentiary weaknesses as the redetermination hearings.

As the Sixth Circuit found in *Hicks*, I conclude that "the risk of an erroneous deprivation under the SSA's current framework is too high." *Hicks*, 909 F.3d at 800. The opportunity to attack the redetermination finding is not equivalent to the ability to attack the determination that similar fault or fraud was involved in an application and explicit instructions to disregard evidence. Because plaintiffs lack access to the factual determinations, they cannot challenge the amount or type of evidence disregarded. Nor can ALJs, because OIG investigation findings are rendered conclusive by law. *See* 42 U.S.C. § 405(u)(2). This would resolve the issue spotted in *Hicks*, where the OIG knew that only a small portion of each physician's report was fraudulently prepared, but the SSA ordered ALJs to disregard any evidence signed by those physicians, including materials

for which there was no claimed reason to believe fraud or similar fault was involved. *Hicks*, 909 F.3d at 801. The same occurred here, where Exhibit 1F included what appeared to be objective evidence from within the closed period and medical evidence from Dr. Ramos, who was not associated with the fraud conspiracy. This tangle of deference to the OIG findings heightens the risk of erroneous deprivation to an untenable level. The impartial ALJ and the existence of a hearing at which the plaintiff may testify could be powerful safeguards, but when the ALJ lacks discretion and the evidence presented and heard comes pre-censored, a high risk of deprivation remains. Moreover, a grant of discretion to ALJs reviewing redeterminations based on OIG investigations should not be burdensome because they already apply discretion in the case of SSA investigations.

As to the final *Mathews* factor, the SSA has a strong interest in reducing costs and maintaining efficiency. The Social Security Act requires the SSA to "immediately redetermine" benefits where there is "reason to believe fraud or similar fault was involved in the application." 42 U.S.C. § 405(u)(1)(A). Additional hearings in which plaintiffs could challenge the OIG finding would take time, thus delaying the redetermination process. The *Robertson* court called this delay "[t]he greatest detriment to the SSA" in requiring such hearings. *Robertson*, 2017 WL 1170873, at *10. Hearings could increase the cost of the redetermination process, though it is probable that ALJs review most redeterminations because former beneficiaries likely challenge their terminations if able. The Sixth Circuit observed that requiring ALJs to review the sufficiency and merits of the OIG investigations would be a great burden in addition to potentially infringing on law enforcement efforts, and the SSA makes the same argument here. *See Hicks*, 909 F.3d at 803; Dkt. 22 at 20. It is unclear, however, why an ALJ would be unable to review OIG evidence in addition to the complex and lengthy records they already endure. The burden additional records create is more likely borne by OIG investigators, who would have to be more detailed in explaining why there is "reason to believe fraud or similar fault" was involved in any individual beneficiary's application in order for ALJs to have sufficient information to review those findings. Alicea's case was one of 7,000 reviewed by the SSA. Bowles Decl. ¶ 5. Such review would not so much infringe

on law enforcement investigations as demand a level of detail and proof from investigators commensurate with the consequences of their findings. Furthermore, the SSA already offers that level of proof because its investigators are not afforded the same level of deference as OIG's, not to mention that waiver applications the SSA promotes as a safeguard also require an individualized finding of fault. If the SSA can rise to meet a burden of thoroughness and factual support, so must the OIG.

The SSA also contends that requiring specific findings in every redetermination would infringe on the authority of the Department of Justice or the OIG "to identify and prosecute program fraud and render findings that can themselves serve as the basis for redeterminations." Dkt. 17 at 17 (citing *Robertson*, 2017 WL 1170873, at *5). Requiring specific findings certainly would be an additional responsibility, but placing OIG investigations on a level with SSA investigations, for example, does not strip away authority to investigate or to prosecute.

## CONCLUSION

On balance, the *Mathews* factors favor Alicea and other plaintiffs whose disability insurance benefits were terminated after this particular OIG investigation led to redeterminations. The administrative burden on the SSA cannot stand up to the risks of erroneous deprivation. Without review or the opportunity to challenge the finding of fraud or similar fault, the statute breaks with *Mathews*. It denies plaintiffs whose benefits are terminated an adequate opportunity to challenge the OIG investigation and the application of those investigations' findings to their individual medical records. Where the government seriously injures an individual based on its factual findings, the individual must be given both access to those facts and the opportunity to prove them untrue. *Greene v. McElroy*, 360 U.S. 474, 496 (1959). This Supreme Court calls this opportunity "immutable in our jurisprudence." *Id.*

As the district court in *Hicks* observed, social security redeterminations are somewhat of an outlier in due process cases. *See Hicks v. Colvin*, 214 F. Supp. 3d at 630 (noting that the opportunity to challenge the facts against them before a neutral arbiter is afforded to: suspected Al Qaeda operatives, employees fired for lying on employment forms, and persons subject to a seizure

of goods pursuant to a writ of replevin). The OIG finding, in contrast, is treated as determinative; there is no provision for claimants to prove that, in their case, reports were neither exaggerated nor fraudulent. The SSA contends that this procedure satisfies due process because claimants may file new benefits applications and the temporary loss of benefits does not outweigh the burdens of additional procedure to the already years-long process. Dkt. 17 at 14–18. A chance to start over cannot erase loss caused by the violation of one's constitutional rights. Alicea's claim for disability insurance benefits was deemed fraudulent without the opportunity for her to rebut that assertion. Similarly, disregarding evidence absent a direct showing that the evidence has been tainted by fraud denies disability insurance beneficiaries a fair opportunity to make their case. Such treatment violates the Due Process Clause of the Fifth Amendment and warrants remand for proceedings consistent with this opinion.

## ORDER

The Due Process clause requires the SSA to give beneficiaries in redetermination cases the opportunity to challenge the application of fraud and similar fault to their cases and the consequent disregard of entire medical reports. Because the plaintiff was denied the opportunity to show why her medical reports were not tainted by fraud, this case is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this ruling. Should Alicea file a motion so requesting, her benefits may be reinstated pending the Commissioner's decision on remand.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 6th day of September, 2019.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge